IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIM. NO. 12-01034 SOM |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER DENYING MOTION TO** |
| vs. | ) | **DISMISS BASED ON ALLEGED DUE** |
| | ) | **PROCESS VIOLATIONS** |
| DONALDSON ENTERPRISES, INC. | ) | |
| (01); | ) | |
| CHARLES DONALDSON (02); and | ) | |
| CARLTON FINLEY (03), | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER DENYING MOTION TO DISMISS BASED
ON ALLEGED DUE PROCESS VIOLATIONS**

I.        **INTRODUCTION.**

This case relates to permitting requirements that the
Government says applied to fireworks seized by the Government.
On April 8, 2011, there was an explosion at the Waileke bunker
where the fireworks were located.  Five people were killed.  The
Superseding Indictment asserts criminal charges against Donaldson
Enterprises, Inc., the company allegedly responsible for storing
and disposing of the fireworks, and two individuals, Charles
Donaldson and Carlton Finley (collectively, "Defendants").

All three Defendants are charged in Count 1 of the
Superseding Indictment of August 6, 2014, with conspiracy to
treat and store hazardous waste without a permit in violation of
the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C.
§ 6928(d)(2)(A) and 18 U.S.C. § 371.  See ECF No. 43.  Counts 2
and 5 of the Superseding Indictment charge Defendants with

<u>treating</u> hazardous waste without a permit in violation of 42 U.S.C. § 6928(d)(2)(A) and 18 U.S.C. § 2.  Count 3 charges Defendants with <u>storing</u> hazardous waste without a permit in violation of 42 U.S.C. § 6928(d)(2)(A) and 18 U.S.C. § 2.[1]

Defendants move for dismissal of the charges, arguing that their due process rights are being violated.  The court denies the motion.

**II.      LAWS GOVERNING HAZARDOUS WASTE STORAGE, TREATMENT, AND DISPOSAL.**

This case involves Defendants' alleged failure to comply with RCRA and Hawaii's Hazardous Waste Management Plan.

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." <u>Meghrig v. KFC W., Inc.</u>, 516 U.S. 479, 483 (1996).  "RCRA's primary purpose . . . is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'"  <u>Id.</u> (quoting 42 U.S.C. § 6902(b)).  To that end, 42 U.S.C. § 6925(a) requires that a permit be obtained for the treatment, storage, or disposal of

---

[1]Defendants are also charged in Count 4 with having made a false statement to United States Customs and Border Protection personnel in violation of 18 U.S.C. § 1001 concerning whether the fireworks were destroyed.  That count is not specifically challenged in the present motions.

hazardous waste.  Criminal penalties are set forth in 42 U.S.C. § 6928(d)(2)(A) for any person who "knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter [42 U.S.C. §§ 6921 to 6939g]--(A) without a permit under this subchapter or pursuant to title I of the Marine Protection, Research, and Sanctuaries Act (86 Stat. 1052) [33 U.S.C. §§ 1411 to 1421]."  Defendants are charged with violating 42 U.S.C. § 6928(d)(2)(A).

As for the elements of a 42 U.S.C. § 6928(d)(2)(A) crime, the Ninth Circuit has held with respect to the mens rea requirement that the Government must prove a defendant's knowledge only of the treatment, storage, or disposal of hazardous waste, not of the permit status.  See United States v. Hoflin, 880 F.2d 1033, 1039 (9th Cir. 1989); see also United States v. Heuer, 4 F.3d 723, 732 (9th Cir. 1993) ("knowledge that the material is waste is also a requirement for conviction under § 6928(d)(2)(A)").  Additionally, the Ninth Circuit has approved of a jury instruction listing as an element that the defendant knew the waste had the potential to be harmful to others or to the environment and was not just an innocuous substance like water, reasoning that this sufficiently described "hazardous" for purposes of the statute.  Hoflin, 880 F.2d at 1039.  Both the Government and Defendants therefore agree that another element of a § 6928(d)(2)(A) charge is that the defendant knew the waste had

3

the potential to be harmful to others or to the environment.  ECF No. 84-1, PageID # 275; ECF No. 89, PageID # 433.

Thus, to prove a violation of § 6928(d)(2)(A), the Government must prove beyond a reasonable doubt that: 1) a defendant knowingly treated, stored, or disposed of hazardous waste; 2) the defendant knew the material had the potential to be harmful to others or to the environment; 3) the material was identified or listed by the United States Environmental Protection Agency as hazardous waste pursuant to RCRA; and 4) the defendant acted without a permit.

Under 42 U.S.C. § 6912, the Administrator of the Environmental Protection Agency is authorized to prescribe regulations to implement RCRA, and also has the job of identifying and listing hazardous wastes.  The Environmental Protection Agency has accordingly issued regulations set forth in Title 40, Part 261 of the Code of Federal Regulations.

The federal Government may authorize a state to administer and enforce RCRA through the state's hazardous waste program.  See 42 U.S.C. § 6926.  Hawaii received federal approval to administer and enforce the state's hazardous waste management plan on November 1, 2001.  See 66 Fed. Reg. 55115-01, 2001 WL 1337427.  The regulations for Hawaii's hazardous waste management plan are set forth in Title 11 of the Hawaii Administrative Rules, Chapters 260 to 280.

One of the main issues in this case is whether the seized fireworks qualify as "hazardous waste" for purposes of RCRA, which defines "hazardous waste" as:

> a solid waste, or combination of solid
> wastes, which because of its quantity,
> concentration, or physical, chemical, or
> infectious characteristics may--
>
> > (A) cause, or significantly contribute to an
> > increase in mortality or an increase in
> > serious irreversible, or incapacitating
> > reversible, illness; or
> >
> > (B) pose a substantial present or potential
> > hazard to human health or the environment
> > when improperly treated, stored, transported,
> > or disposed of, or otherwise managed.

42 U.S.C.A. § 6903(5).

The term "solid waste" is further defined by RCRA as follows:

> "[S]olid waste" means any garbage, refuse,
> sludge from a waste treatment plant, water
> supply treatment plant, or air pollution
> control facility and other discarded
> material, including solid, liquid, semisolid,
> or contained gaseous material resulting from
> industrial, commercial, mining, and
> agricultural operations, and from community
> activities, but does not include solid or
> dissolved material in domestic sewage, or
> solid or dissolved materials in irrigation
> return flows or industrial discharges which
> are point sources subject to permits under
> section 1342 of Title 33, or source, special
> nuclear, or byproduct material as defined by
> the Atomic Energy Act of 1954, as amended (68
> Stat. 923) [42 U.S.C.A. § 2011 et seq.].

42 U.S.C.A. § 6903(27)

In addition to the above statutory language, the Environmental Protection Agency's regulations define "solid waste" as any "discarded material" that is not excluded by other provisions, including any material:

> (A) Abandoned, as explained in paragraph (b) of this section; or
>
> (B) Recycled, as explained in paragraph (c) of this section; or
>
> (C) Considered inherently waste-like, as explained in paragraph (d) of this section; or
>
> (D) A military munition identified as a solid waste in § 266.202.

40 C.F.R. § 261.2.  Hawaii's Administrative Rules define "solid waste" similarly.  See Haw. Admin. R. 11-261-2.

In 40 C.F.R. § 261.20 of the RCRA regulations, a "solid waste" (as defined in 40 C.F.R. § 261.2) is a "hazardous waste" when it is not excluded by the regulations and exhibits any of the following characteristics: 1) ignitability (40 C.F.R. § 261.21); 2) corrosivity (40 C.F.R. § 261.22); 3) reactivity (40 C.F.R. § 261.23); or toxicity (40 C.F.R. § 261.24).  Hawaii's Administrative Rules define when a "solid waste" is a "hazardous waste" similarly.  See Haw. Admin. R. 11-261-3.

The parties have focused on the characteristic of reactivity.  A "solid waste" demonstrates reactivity when "[i]t is capable of detonation or explosive reaction if it is subjected to a strong initiating source or if heated under confinement," or

6

"[i]t is readily capable of detonation or explosive decomposition or reaction at standard temperature and pressure."  40 C.F.R. § 261.23(a)(6) and (7).  Hawaii's administrative rules define "reactivity" similarly, stating that a solid waste exhibits the characteristic of reactivity when "[i]t is capable of detonation or explosive reaction if it is subjected to a strong initiating source or if heated under confinement," or "[i]t is readily capable of detonation or explosive decomposition or reaction at standard temperature and pressure."  Hawaii Administrative Rule § 11-261-23.

Hawaii's Hazardous Waste Permit Program is managed by the Department of Health, Solid & Hazardous Waste Branch, and is set forth in Chapter 270 of the Hawaii Administrative Rules.  See Declaration of Gracelda M. Simmons ¶ 2, ECF No. 128-1, PageID # 1447.  Section 11-270-1(b) of the Hawaii Administrative Rules states, "Treatment, storage, or disposal of hazardous waste by any person who has not applied for or received a hazardous waste management permit is prohibited."

There is an exclusion from Hawaii's permitting requirements when there is

> [a]n immediate threat to human health, public safety, property, or the environment from the known or suspected presence of military munitions, other explosive material, or an explosive device, as determined by an explosive[s] or munitions emergency response specialist as defined in section 11-260-10.

7

Haw. Admin. R. § 11-270-1(c)(3)(i)(D).  Section 11-260-10 defines

"explosives or munitions emergency response specialist" as

> an individual trained in chemical or
> conventional munitions or explosives
> handling, transportation, render-safe
> procedures, or destruction techniques.
> Explosives or munitions emergency response
> specialist include U.S. Department of Defense
> (DOD) emergency explosive ordnance disposal
> (EOD), technical escort unit (TEU), and DOD-
> certified civilian or contractor personnel,
> and other federal, state, or local
> government, or civilian personnel similarly
> trained in explosives or munitions emergency
> responses.

When no "explosives or munitions emergency response

specialist" determines that explosive material poses an immediate

threat to human health, public safety, property, or the

environment, the Hawaii Administrative Rules do not automatically

require a regular Hazardous Waste Permit.  Instead, an Emergency

Hazardous Waste Permit (sometimes called a "Temporary Emergency

Permit") is available under section 11-270-61 of the Hawaii

Administrative Rules when there is "an imminent and substantial

endangerment to human health or the environment."

**III.       FACTUAL BACKGROUND.**

On December 10, 2007, U.S. Customs and Border

Protection, an agency within the Department of Homeland Security,

seized 11 pallets of fireworks (the "Lindsey Fireworks").  <u>See</u>

Superseding Indictment ¶ 11, ECF No. 43, PageID # 142.  On

January 13, 2010, Homeland Security Investigations seized 17

8

pallets of other fireworks (the "Chang Fireworks").  See id.; ECF
No. 131-2, PageID # 1517 (Custody Receipt for Seized Property).
The Chang Fireworks had been originally detained on December 18,
2009, by U.S. Customs and Border Protection.  See ECF No. 131-1,
PageID # 1515; ¶ 1, ECF No. 131-11, PageID # 1594.  The Chang
Fireworks were assigned seizure number 2010-3205-000012-01.
Decl. of Lisa Leung ¶ 4, ECF No. 131-11, PageID # 1594.
Defendant Donaldson Enterprises, Inc. ("DEI"), sometimes
incorrectly identified the Chang Fireworks as 2010-3205-00001**3**-
01.  See E-mail from Carlton Finley to Darin Yamamoto (Dec. 13,
2010) (stating that the number was wrong and should be
corrected).

VSE, Inc., had a nationwide contract with the U.S.
Government to transport, store, and dispose of materials seized
by the Department of Homeland Security.  See Superseding
Indictment ¶ 11, ECF No. 43, PageID # 141-42.  On January 13,
2010, through Lisa Leung, a Fines, Penalties, and Forfeitures
Officer with U.S. Customs and Border Protection, issued a
Disposition Order to "consign the seized fireworks to the VSE
contractor."  ECF No. 131-3, PageID # 1519; Leung Decl. ¶ 5, ECF
No. 131-11, PageID # 1594.  According to Leung, her job includes
tracking seized property through forfeiture proceedings, issuing
notices of seizures to interested parties, and managing and

directing the process of handling seized property.  See Leung Decl. ¶ 2, PageID # 1594.

DEI is a Hawaii corporation that provides unexploded ordnance disposal and environmental services.  See Superseding Indictment ¶ 12, ECF No. 43, PageID # 142.  Its director of operations is Defendant Charles Donaldson.  Id. ¶ 13.  Defendant Carlton Finley is DEI's project manager responsible for DEI's obligations under VSE's contract with DEI.  See Superseding Indictment ¶ 14.

On March 18, 2010, DEI contracted with VSE to transport, store, and dispose of the Lindsey Fireworks and the Chang Fireworks.  See Superseding Indictment ¶ 15, ECF No. 43, PageID # 142; ECF No. 131-4 (copy of contract).  As accepted by Michelle Eugenio, DEI's treasurer, the contract incorporates Supplement 1B and a Statement of Work.  Id., PageID # 1525-26.

Supplement 1B to the contract states:

> Seller/Subcontractor [defined as the entity contracting with VSE, Id., PageID # 1533] shall comply with all applicable local, state and federal laws, orders, rules, regulations, and ordinances.  Seller/Subcontractor agrees to pay the cost(s) of any fees, license, permits, and/or other required charges, and comply with the guidelines and directives of any local, states, or federal government authority.

Id., PageID # 1536.

According to the Statement of Work (which was part of a Request for Quotation), the "contractor [DEI] shall transport

10

property from the point of acceptance to storage and adhere to
all local, state, and federal laws and make any necessary
emergency repairs to facilitate movement and storage" and "shall
destroy property in accordance with federal, state, and local
laws, codes, ordinances, and regulations."  ECF No. 131-4, PageID
# 1549.

On February 17, 2009, DEI took custody of the Lindsey
Fireworks.  A year later, on February 16, 2010, DEI was told that
the Lindsey Fireworks were no longer needed as evidence and
should be destroyed.  Id. ¶ 17.

In January 2010, Carolyn R. Reck-Owens, an explosives
enforcement officer with the Federal Bureau of Alcohol, Tobacco,
Firearms, and Explosives ("ATF"), examined the fireworks.  See
Trial Testimony of Carolyn R. Reck-Owens at 9, ECF No. 126-5,
PageID # 1276 (given in United States v. Chang, Cr. no. 11-00478
HG).  Reck-Owens concluded that the fireworks contained more
explosive material than permitted for consumer-grade fireworks.
See ECF No. 126-4, PageID #s 1255-64 (September 27, 2010,
report); Reck-Owens Test. at 25, PageID # 1292.  She also
concluded that the fireworks were not labeled correctly.  Id. at
26, PageID # 1293.

On February 8, 2010, Leung, the Fines, Penalties, and
Forfeitures Officer, issued a Notice of Seizure with respect to
the Chang Fireworks, thereby starting the administrative

11

forfeiture process with respect to those fireworks.  On March 22, 2010, the fireworks were forfeited to the United States.  <u>See</u> Leung Decl. ¶ 6, ECF No. 131-11, PageID # 1595; Declaration of Administrative Forfeiture, ECF No. 126-9, PageID # 1338.

On or about March 24, 2010, Brandon Silva, an Immigration and Customs Enforcement Special Agent in Hawaii, sent a memorandum to Leung.  <u>See</u> ECF No. 131-5, PageID # 1579; Declaration of Lisa Leung ¶ 1, ECF No. 131-11, PageID # 1594. This memorandum stated that four boxes of Chang Fireworks were to be retained for the criminal case against Gifford Chang, and that Assistant United States Attorney Lou Bracco "concur[red] with the retention of the evidence . . . relating to the possible criminal case."  The memorandum included Bracco's handwritten notation, which said, "Please ensure that destruction of fireworks evidence <u>Not</u> retained is witnessed as provided in T18 USC § 844(c)(2)." ECF No. 131-5, PageID # 1579.

ICE Agent Silva reportedly read Bracco's handwritten note as "indicating what was to be stored and what was to be disposed."  ECF No. 126-4, PageID # 1248 (summarizing post-explosion statement by Silva).  Silva allegedly noted that Bracco, as the AUSA in charge of the criminal case against Gifford Chang, had been asked by Customs and Border Protection to state what needed to be kept and what could be destroyed.

For her part, Lisa Leung did not read Bracco's handwritten note as ordering that all but four boxes of the Chang Fireworks be destroyed.  See Leung Decl. ¶ 11, ECF No. 131-11, PageID # 1596.  Indeed, Leung viewed Bracco as not having the authority to order the destruction of the fireworks.  Id. Instead, Bracco was a prosecutor focused on what evidence he needed in "the possible criminal case."  ECF No. 131-5, PageID # 1579.

On March 29, 2010, DEI, using Island Movers, had the Chang Fireworks taken to Bunker A-21 in a storage facility in the Waikele area of Oahu.  See DEI's unexploded ordnance report for March 29, 2010, ECF No. 131-8, PageID # 1587.  DEI was already storing other seized fireworks in Bunker A-21.  See Leung Decl. ¶ 7, ECF No. 131-11, PageID # 1595.

Leung says she was actually the person vested with the authority to determine what to do with the Chang Fireworks. Leung says that, on April 16, 2010, she issued a Disposition Order directing the destruction of most of the Chang Fireworks (64 CC Halawa, 69 KK Krazy Kids, 64 RR O Triple C, and 95 SF Sky Festival).  See Leung Decl. ¶¶ 8-9, ECF No. 131-11, PageID # 1596; Disposition Order of April 16, 2010, ECF No. 131-10, PageID # 1592; ECF No. 126-14, PageID # 1349 (same).  VSE sent a copy of that Disposition Order to DEI on May 26, 2010.  See ECF No. 126-15, PageID # 1351.

13

According to an investigative report, Terry Corpus, an
On-Scene Coordinator in the Hazard Evaluation and Emergency
Response Section of the Hawaii Department of Health, had
initially planned to allow Defendants to burn the Chang Fireworks
without a permit.  See ECF No. 125-3, PageID # 1203.  But Corpus,
not being an "explosives or munitions emergency response
specialist" as defined in Haw. Admin. R. § 11-260-10, was not
authorized to determine that the fireworks could be disposed of
without a permit pursuant to Haw. Admin. R. § 11-270-
1(c)(3)(i)(D).  Decl. of Terry Corpus ¶ 3, ECF No. 128-4, PageID
# 1459.  Gracelda M. Simmons, a supervisor in the Hazardous Waste
Section of the Department of Health, Solid & Hazardous Waste
Branch, told Corpus that a Temporary Emergency Permit was needed
because there was no immediate threat justifying the destruction
of the Chang Fireworks without a permit.  See ECF No. 125-3,
PageID # 1203; Declaration of Gracelda M. Simmons ¶ 1, ECF No.
128-1, PageID # 1447 (indicating her legal name is Gracelda,
although she is identified as "Grace" in the investigative
report).

Simmons additionally reasoned that the very existence
of DEI's contract to dispose of the fireworks was an indication
of the lack of an immediate threat justifying the destruction of
the Chang Fireworks without a permit.  See ECF No. 125-3.
Simmons states that, like Corpus, she is not an "explosives or

14

munitions emergency response specialist" as defined in Haw. Admin. R. § 11-260-10.  See id. ¶ 5, PageID # 1448.

An Investigative Activity Report summarizes statements by Simmons explaining that there are two types of emergency permits.  When there is an "imminent and substantial danger" that something will explode, such as unexploded ordnance, an oral permit may be given over the phone.  Otherwise, a 90-day Temporary Emergency Permit may be issued.  According to Simmons, when fireworks are seized and being held as evidence, they are not considered hazardous waste.  But, Simmons says, when the fireworks are turned over for disposal after they are no longer needed as evidence, they are hazardous waste for which a permit is necessary.  See ECF No. 128-3, PageID # 1454.

Simmons says Hawaii's Department of Health "views all illegal fireworks seized by the government as posing an 'imminent and substantial endangerment to human health or the environment.'"  Simmons Decl. ¶ 4, ECF No. 128-1, PageID # 1447.  She says the department uses the Temporary Emergency Permit scheme to regulate the treatment, storage, and disposal of illegal fireworks, as opposed to a regular Hazardous Waste Permit, which can take 3 to 5 years to be approved.  See id. ¶¶ 3-4.

DEI had prior experience with Hawaii's emergency permit process, having gotten, on June 8, 2010, a 90-day Temporary

Emergency Permit to transport the Lindsey Fireworks to the Koko
Head Firing Range for burning.  <u>See</u> ECF No. 128-6, PageID # 1477
(letter re permit); ECF No. 108-6 (copy of permit); Superseding
Indictment ¶ 20, ECF No. 43, PageID # 144.  That permit stated
that the fireworks were "solid wastes that exhibit the
characteristic of reactivity, which has a D003 EPA hazardous
waste number."  ECF No. 108-6, PageID # 788.  From June 8 to
September 5, 2010, DEI allegedly treated, transported, and
disposed of the Lindsey Fireworks by burning them at the Koko
Head Firing Range.  <u>Id.</u> ¶ 21; ECF No. 122-6 (DEI report
indicating that 250 to 300 pounds of Lindsey Fireworks were
burned at the Koko Head Firing Range); ECF No. 122-4, PageID
# 1105 (DEI report indicating that, on June 29, 2010, DEI was
preparing fireworks for burning at the Koko Head Firing Range).
The Temporary Emergency Permit expired on September 5, 2010.  <u>Id.</u>
¶ 22.

After the Temporary Emergency Permit had expired,
Defendants allegedly continued to store and treat seized
fireworks at the Waikele bunker.  DEI employees allegedly broke
apart or cut the fireworks and/or soaked them in diesel fuel.
<u>Id.</u> ¶¶ 23-24.

Also, until March 23, 2011, Defendants allegedly
disposed of what the Government claims was reactive hazardous
waste at the Schofield Army Barracks range without a permit.  <u>Id.</u>

16

¶ 26, PageID # 145.  DEI's Daily Unexploded Ordnance Reports provide some detail of what was done.  For example, on September 30, 2010, a DEI team began opening boxes of fireworks and separating the fireworks.  See ECF No. 122-3, PageID # 1102.  On November 29, 2010, DEI indicated that it had 5 drums of fireworks that had been presoaked in diesel fuel and were ready to burn, as well as 6 containers of black powder that were ready to burn.  See ECF No. 122-13, PageID # 1173.  On December 6, 2010, Defendant Carlton Finley sent an e-mail to Darin Yamamoto of VSE, indicating that DEI was burning fireworks every weekday and that 1.5% of the Chang Fireworks had been destroyed.  ECF No. 122-7, PageID # 1126.

On April 8, 2011, DEI was allegedly storing black powder and flash powder resulting from the treatment of fireworks at the Waikele bunker.  Something caused the powder to ignite. There was an explosion that killed five people.  See Superseding Indictment ¶ 27, ECF No. 43, PageID # 145-46.

**IV.        ANALYSIS.**

On June 13, 2016, Defendants filed a joint motion to dismiss for due process violations.  See ECF No. 125.  The court denies the motion.

### A.   Defendants Do Not Show That Simmons Violated Defendants' Due Process Rights.

Defendants first argue that Simmons acted arbitrarily or capriciously, in violation of their due process rights, when

she denied them the opportunity to destroy fireworks without a permit on an emergency basis pursuant to Haw. Admin. R. § 11-270-1(c)(3)(i)(D).  See ECF No. 125-1, PageID # 1187.  That section states that no hazardous waster permit is necessary when there is:

> [a]n immediate threat to human health, public safety, property, or the environment from the known or suspected presence of military munitions, other explosive material, or an explosive device, as determined by an explosive[s] or munitions emergency response specialist as defined in section 11-260-10.

Haw. Admin. R. § 11-270-1(c)(3)(i)(D).

Defendants say that, had they been allowed to dispose of the fireworks without a permit, they would not now be facing charges of having stored and treated a hazardous waste without a permit.  Id., PageID # 1189.  Defendants therefore argue that Simmons, who was acting on behalf of the Hazardous Waste Section of Hawaii's Department of Health, Solid & Hazardous Waste Branch, violated section 91-14(g)(6) of the Hawaii Revised Statutes by acting in a manner that was "'[a]rbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.'"  See Del Monte Fresh Produce (Haw.), Inc. v. Int'l Longshore & Warehouse Union, Local 142, AFL-CIO, 112 Haw. 489, 499, 146 P.3d 1066, 1076 (2006) (quoting Haw. Rev. Stat. 91-14(g)(6)).

18

Defendants point to Terry Corpus, the On-Scene Coordinator in the Hazard Evaluation and Emergency Response Section of the Hawaii Department of Health, who, they say, was initially going to allow Defendants to burn the Chang Fireworks without a permit.  See ECF No. 125-3, PageID # 1203.  Corpus had considered allowing the destruction in that manner pursuant to the "immediate threat" exclusion in section 11-270-1(c)(3)(i)(D), but Simmons told him that Defendants needed a Temporary Emergency Permit.  As noted earlier in this order, part of Simmons's reasoning was that DEI's contract to destroy the fireworks was evidence that there was no "immediate threat."  Defendants do not establish that this was an arbitrary or capricious act or decision.

On this motion, Defendants do not show that the prerequisites for the "immediate threat" exception were met. This court has before it nothing indicating that an "explosives or munitions emergency response specialist" had determined that the seized fireworks posed an "immediate threat to human health, public safety, property, or the environment," as required by section 11-270-1(c)(3)(i)(D).  Moreover, no one is contending that either Corpus or Simmons was an "explosives or munitions emergency response specialist," as defined in Haw. Admin. R. § 11-260-10.  Neither appears to have had the authority to determine that section 11-270-1(c)(3)(i)(D) of the Hawaii

Administrative Rules allowed the fireworks to be disposed of without a permit.  Decl. of Terry Corpus ¶ 3, ECF No. 128-4, PageID # 1459; Decl. of Gracelda M. Simmons ¶ 5, ECF No. 128-1, PageID # 1448.

As Simmons explained, no permit is necessary under section 11-270-1(c)(3)(i)(D) when there is an "imminent and substantial danger" that something, such as unexploded ordnance, will explode.  See ECF No. 128-3, PageID # 1454.  Section 11-270-1(c)(3)(i)(D) applies when, for example, a bomb or munitions must be destroyed immediately to end a safety risk.  Simmons's understanding is consistent with the EPA's rulemaking statements.  In Military Munitions Rule: Hazardous Waste Identification and Management; Explosives Emergencies; Manifest Exemption for Transport of Hazardous Waste on Right-of-Ways on Contiguous Properties, 62 FR 6622-01, the EPA states:

> Today's rule clarifies that EPA considers immediate or time-critical responses to explosives or munitions emergency responses to be an immediate response to a discharge or imminent and substantial threat of a discharge of a hazardous waste . . . .  If an immediate response, however, is clearly not necessary to address the situation, and a response can be delayed without compromising safety or increasing the risks posed to life, property, health, or the environment, the responding personnel, if time permits, should consult with the regulatory agency regarding the appropriate course of action (e.g., whether or not to seek a RCRA emergency permit under § 270.61, or regular facility permit under 40 CFR Part 270).  Situations where an immediate response is needed would

> include instances where the public or
> property is potentially threatened by an
> explosion.  Situations where an immediate
> response is clearly not necessary would
> include instances where the public or
> property are not threatened by a potential
> explosion (e.g., in remote areas such as some
> former ranges or where immediate action is
> not necessary to prevent explosion or
> exposure).  In these cases, there is time to
> consult with the EPA or State regulatory
> agency on how to proceed.

Simmons notes that Defendants had contracted to both store and
dispose of seized fireworks, indicating that there was not an
"immediate threat to human health, public safety, property, or
the environment" justifying the immediate destruction of the
fireworks without a permit.

Defendants characterize Simmons's application of the
Hawaii Administrative Rules as "nonsensical."  ECF No. 125-1,
PageID # 1190.  Defendants question how Simmons could say that
the immediate threat exclusion was inapplicable, but that a
Temporary Emergency Permit had be obtained.  Id.  Defendants
appear to be comparing apples to oranges.  The exclusion to the
hazardous waste permit requirement in section 11-270-
1(c)(3)(i)(D) applies only when an "explosive[s] or munitions
emergency response specialist" determines that there is an
"immediate threat to human health, public safety, property, or
the environment."  Absent that determination, a Temporary
Emergency Permit is available under section 11-270-61 of the

Hawaii Administrative Rules when there is "an imminent and substantial endangerment to human health or the environment."

Simmons says her department "views all illegal fireworks seized by the government as posing an "an imminent and substantial endangerment to human health or the environment.'" Simmons Decl. ¶ 4, ECF No. 128-1, PageID # 1447.  She says that the use of the Temporary Emergency Permit scheme to regulate the treatment, storage, and disposal of illegal fireworks allows for quicker processing of a permit request than is available for a regular Hazardous Waste Permit.  See id. ¶¶ 3-4.

Defendants rely heavily on the Reck-Owens report, ECF No. 126-4, PageID #s 1255-64, in arguing that the fireworks were very dangerous.  That ATF report certainly concludes that the fireworks were not properly labeled and were not actually consumer-grade fireworks.  But the report does not actually suggest that the fireworks posed an "immediate threat."  It does not, for example, say the fireworks were so dangerous that they should have been destroyed on the spot or that they were too dangerous to transport to a different location.  Defendants do not identify any statement in the report that establishes that the State of Hawaii, through Simmons, acted arbitrarily or capriciously in requiring Defendants to get a Temporary Emergency Permit to destroy the fireworks.

Nor is the court persuaded that Defendants can reasonably rely on AUSA Bracco's handwritten note as evidence of an arbitrary or capricious application of the permit requirement. Bracco's note said, "Please ensure that destruction of fireworks evidence Not retained is witnessed as provided in T18 USC § 844(c)(2)." ECF No. 131-5, PageID # 1579. That note was apparently written about a week before DEI took possession of the fireworks. Compare ECF No. 131-5, PageID # 1579 (note dated March 24, 2010), with ECF No. 131-8, PageID # 1587 (DEI's unexploded ordnance report for March 29, 2010, indicating that DEI had taken custody of the Chang Fireworks and transported them to Bunker A-21 of the Waikele storage facility using Island Movers). Although Defendants correctly point out that the statute Bracco refers to applies to seizures of explosive materials that "would be impracticable or unsafe" to move to a place of storage or "unsafe to store," that does not mean that destruction of the fireworks should have been allowed without a permit. Nothing in the record indicates that the AUSA was an "explosive[s] or munitions emergency response specialist" who could make a finding of an "immediate threat," as required by section 11-270-1(c)(3)(i)(D) of Hawaii Administrative Rules.

At the hearing on the present motion, Defendants argued that the fireworks were not stable and that Customs had declined to inspect them based on their dangerousness. Defendants are

using the wrong test for arbitrariness or capriciousness.  The
applicable regulation says that it is an "explosive[s] or
munitions emergency response specialist" who must determine that
there is an "immediate threat to human health, public safety,
property, or the environment."  Defendants do not cite law or
evidence establishing that, when there is no such determination
by an "explosive[s] or munitions emergency response specialist"
but a Customs official expresses concern, it is arbitrary or
capricious to require a permit.

### B.    The Rule of Lenity is Inapplicable.

According to Defendants, at the very least, the
"confusing interplay" between section 11-270-1(c)(3)(i)(D) and
section 11-270-61 justifies application of the Rule of Lenity.
ECF No. 125-1, PageID # 1191.  This court is not persuaded on the
present record that the Rule of Lenity applies, much less calls
for dismissal.

"The rule of lenity provides that "'ambiguity
concerning the ambit of criminal statutes should be resolved in
the favor of lenity.'"  United States v. LeCoe, 936 F.2d 398, 402
(9th Cir. 1991) (quoting Rewis v. United States, 401 U.S. 808,
812 (1971)).  In other words, the "rule of lenity 'requires
ambiguous criminal laws to be interpreted in favor of the
defendants subjected to them.'"  United States v. Nader, 542 F.3d
713, 721 (9th Cir. 2008) (quoting United States v. Santos, 553

U.S. 507, 514 (2008)).  But the Rule of Lenity is applied "'only when, after consulting traditional canons of statutory construction,'" one is left with an ambiguous law.  See United States v. Hayes, 555 U.S. 415, 429 (2009) (quoting United States v. Shabani), 513 U.S. 10, 17 (1994)).

Defendants fail to show that any statute, rule, or regulation applicable to the charges in this case triggers the Rule of Lenity.  Section 11-270-1(b) of the Hawaii Administrative Rules required Defendants to obtain a Hazardous Waste Permit for any treatment, storage, or disposal of hazardous waste. Defendants could have satisfied this requirement by obtaining a Temporary Emergency Permit under section 11-270-61 of the Hawaii Administrative Rules (applicable when there is "an imminent and substantial endangerment to human health or the environment"). Alternatively, if Defendants satisfied the requirements for an "immediate threat" exemption as set forth in section 11-270-1(c)(3)(i)(D) of the Hawaii Administrative Rules, no permit was necessary for the destruction of hazardous waste.  Defendants' argument is that an "imminent endangerment" is indistinguishable from an "immediate threat" and that the provisions are therefore ambiguous.

What Defendants ignore is the different situations to which section 11-270-1(c)(3)(i)(D) and section 11-270-61 apply. It is not the case, as Defendants contend, that "[o]ne rule

25

requires a permit, the other does not" under the same circumstances.  ECF No. 125-1, PageID # 1193.  Whether an item poses an "immediate threat to human health, public safety, property, or the environment" is a matter that only a specialist is authorized to determine.  No one authorized to declare the fireworks an "immediate threat" had made such a declaration.  Accordingly, Defendants were required to obtain a permit for the treatment, storage, or disposal of hazardous waste.  See Haw. Admin. Rs. §§ 11-270-1(b) and 11-270-61.  Defendants do not show that they were required by any provision to distinguish between an "imminent endangerment" and an "immediate threat."  In the absence of such a showing, the court does not see why lenity is implicated.

### C.    Defendants Do Not Show That The Definition of "Reactivity" is Unconstitutionally Vague.

Defendants also challenge the rules relating to the treating and storing of hazardous waste as unconstitutionally vague.  As discussed above, a regular Hazardous Waste Permit is required by law when a person treats, stores, or disposes of hazardous waste, unless the "immediate threat" exemption applies or a Temporary Emergency Permit is obtained.  See Haw. Admin. R. § 11-270-1(b) ("Treatment, storage, or disposal of hazardous waste by any person who has not applied for or received a hazardous waste management permit is prohibited."); Haw. Admin.

R. § 11-270-1(c)(3)(i)(D) ("immediate threat" exemption); Haw.
Admin. R. § 11-270-61 (Temporary Emergency Permit).

In relevant part, a "solid waste" (as defined in 40
C.F.R. § 261.2) is a "hazardous waste" when it is not excluded by
the regulations and is ignitable, corrosive, reactive, or toxic.
Haw. Admin. R. § 11-261-3.  A "solid waste" is reactive if "[i]t
is capable of detonation or explosive reaction if it is subjected
to a strong initiating source or if heated under confinement," or
"[i]t is readily capable of detonation or explosive decomposition
or reaction at standard temperature and pressure."  Haw. Admin.
R. §§ 11-261-23(6), (7).

Defendants argue that the definition of "reactivity" in
Hawaii Administrative Rule §§ 11-261-23 (6) and (7) is void for
vagueness.  On the present record, the court concludes that
Defendants' argument is unpersuasive.

The Supreme Court has explained the "void for
vagueness" principle:

> It is a basic principle of due process that
> an enactment is void for vagueness if its
> prohibitions are not clearly defined.  Vague
> laws offend several important values.  First,
> because we assume that man is free to steer
> between lawful and unlawful conduct, we
> insist that laws give the person of ordinary
> intelligence a reasonable opportunity to know
> what is prohibited, so that he may act
> accordingly.  Vague laws may trap the
> innocent by not providing fair warning.
> Second, if arbitrary and discriminatory
> enforcement is to be prevented, laws must
> provide explicit standards for those who

27

> apply them.  A vague law impermissibly
> delegates basic policy matters to policemen,
> judges, and juries for resolution on an ad
> hoc and subjective basis, with the attendant
> dangers of arbitrary and discriminatory
> application.  Third, but related, where a
> vague statute abuts upon sensitive areas of
> basic First Amendment freedoms, it operates
> to inhibit the exercise of those freedoms.
> Uncertain meanings inevitably lead citizens
> to steer far wider of the unlawful zone than
> if the boundaries of the forbidden areas were
> clearly marked.

Grayned v. City of Rockford, 408 U.S. 104, 109 (1972) (quotation

marks, citations, and alterations omitted).  The Ninth Circuit

has therefore stated that a criminal statute is void for

vagueness when it is not sufficiently clear to provide citizens

with guidance as to how they can avoid it and to provide

authorities with principles governing enforcement.  United States

v. Harris, 705 F.3d 929, 932 (9th Cir. 2013).

"In an as-applied challenge, a statute is

unconstitutionally vague if it fails to put a defendant on notice

that his conduct was criminal."  Harris, 705 F.3d at 932

(quotation marks, citations, and alterations omitted).  In a

facial challenge, "a statute is unconstitutionally vague if it

fails to provide a person of ordinary intelligence fair notice of

what is prohibited, or is so standardless that it authorizes or

encourages seriously discriminatory enforcement."  Id.  The Ninth

Circuit's discussion in Harris about facial challenges cites

United States v. Kilbride, 584 F.3d 1240, 1257 (9th Cir. 2009),

28

which in turn quotes United States v. Williams, 553 U.S. 285, 304 (2008). Williams noted that ordinarily one who engages in clearly proscribed conduct "cannot complain of the vagueness of the law as applied to the conduct of others," but that "we have relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." In this non-First Amendment case, Defendants bring a facial challenge to the regulations, rather than an as-applied challenge. See ECF No. 125-1, PageID # 1199.

The Government cites United States v. Maslenjak, 821 F.3d 675, 695 (6th Cir. 2016), which, making the point noted above in Williams, states, "A challenge based on a statute's purported vagueness must be considered on 'an as-applied basis' so long as the statute does not involve First Amendment rights." In stating this proposition, the Sixth Circuit cites to Johnson v. United States, 135 S. Ct. 2551, 2580 (2015), and refers to the cited page in Johnson as being part of a concurring opinion by Justice Clarence Thomas. Defendants note that the page cited by the Sixth Circuit is actually part of Justice Samuel Alito's dissent in Johnson. This citation error, however, does not nullify the proposition. Justice Alito's dissent cited United States v. Mazurie, 419 U.S. 544, 551 (1975), which, like Williams, clearly held, "It is well established that vagueness

challenges to statutes which do not involve First Amendment
freedoms must be examined in the light of the facts at hand."
The Ninth Circuit in <u>Harris</u> recognizes that vagueness challenges
that do not involve First Amendment freedoms must be examined in
light of the facts of the case.   705 F.3d at 932.

> ### 1. Defendants Do No Show That The Administrative Rules Failed to Provide Them With Adequate Notice.

"A defendant is deemed to have fair notice of an
offense if a reasonable person of ordinary intelligence would
understand that his or her conduct is prohibited by the rule in
question."   <u>United States v. Hogue</u>, 752 F.2d 1503, 1504 (9th Cir.
1985).

As noted earlier in this order, the applicable
provisions in the Hawaii Administrative Rules state that a "solid
waste" demonstrates reactivity when "[i]t is capable of
detonation or explosive reaction if it is subjected to a strong
initiating source or if heated under confinement," or "[i]t is
readily capable of detonation or explosive decomposition or
reaction at standard temperature and pressure."   Haw. Admin. R.
§§ 11-261-23(6) and (7).   No reported decision even discusses
whether this definition, or its Code of Federal Regulations
counterpart at 40 C.F.R. §§ 261.23(a)(6) and (7), is void for
vagueness.

However, the Ninth Circuit has examined whether another hazardous waste subsection, 40 C.F.R. § 261.23(a)(5), is void for vagueness.  In United States v. Elias, 269 F.3d 1003 (9th Cir. 2001), Allen Elias was convicted of disposing of hazardous waste without a permit, knowing that his action placed others in imminent danger of death or serious bodily injury in violation of 42 U.S.C. § 6928(e).  Elias had a tank in which he had stored the byproducts of a cyanide leaching process.  He knew there was cyanide-laced sludge at the bottom of the tank.  Planning to use the tank to store sulfuric acid, he ordered his employees to go into the tank to wash out the cyanide sludge without wearing safety equipment.  One of the employees collapsed in the tank and was taken to a hospital, which found extremely toxic levels of cyanide in his body.  Id. at 1007-08.

On appeal, Elias contended that the EPA regulation applicable to when cyanide is reactive, 40 C.F.R. § 261.23(5), was void for vagueness.  That provision provided:

> A solid waste exhibits the characteristic of reactivity [and is thus hazardous waste] if a representative sample of the waste . . . (5) is a cyanide . . . bearing waste which, when exposed to pH conditions between 2 and 12.5, can generate toxic gases, vapors or fumes in a quantity sufficient to present a danger to human health or the environment.

In examining the "void for vagueness" challenge, the Ninth Circuit began with the general rule that a "criminal statute is not vague if it provides adequate notice in terms that

31

a reasonable person of ordinary intelligence would understand
that his conduct is prohibited." Id. at 1014 (quotation marks,
citation, and alterations omitted).  The court noted, however,

> if the statutory prohibition involves conduct
> of a select group of persons having
> specialized knowledge, and the challenged
> phraseology is indigenous to the idiom of
> that class, the standard is lowered and a
> court may uphold a statute which uses words
> or phrases having a technical or other
> special meaning, well enough known to enable
> those within its reach to correctly apply
> them.

Id. (quotation marks and citation omitted).

Defendants contend that the lack of definitions in the
administrative rules at issue leaves people uncertain of what is
prohibited and provides insufficient guidance as to what the
Government expects.  See ECF No. 125-1, PageID #s 1197-98.
Defendants note that the administrative rules are silent as to
what is meant by "detonation," "explosive reaction," and "strong
initiating source."  Id., PageID # 1198.  Defendants also point
out that there are many things that may explode when "heated
under confinement."  Id.  Defendants complain that it is unclear
what is meant by "readily capable of detonation or explosive
decomposition or reaction at standard temperature and pressure."
Id.  The lack of definitions, according to Defendants, means that
hazardous wastes can include things as innocuous as soft drinks,
cottage cheese, and milk, all of which may explode when heated

under confinement.  Defendants conclude that the rules failed to give them sufficient notice that their conduct was illegal.

Defendants join the growing ranks of those raising vagueness arguments under Johnson v. United States, 135 S. Ct. 2551, 2560-61 (2015).  Johnson involved the residual clause in 18 U.S.C. § 924(e).  The "residual clause" defined "violent felony" as "involv[ing] conduct that presents a serious potential risk of physical injury to another."  Johnson held that the indeterminate nature of that clause "both denies fair notice to defendants and invites arbitrary enforcement."  Id.  The Court said that the "residual clause" left "grave uncertainty about how to estimate the risk posed by a crime."  Id.  For example, in an attempted burglary, would a judge think that a violent encounter might ensue when the would-be robber was confronted by a homeowner, or would the judge think that the homeowner might ask, "Who's there?"  The "residual clause" offered no reliable way of choosing between the alternatives.  Id. at 2558.  The Court was also troubled by the difficulty of applying the phrase "serious potential risk of physical injury" to a crime like extortion if the typical extortionist threatens to reveal embarrassing personal information rather than to physically harm someone.[2]

---

[2]In Johnson, the Court looked to the categorical approach outlined in Taylor v. United States, 495 U.S. 575 (1990), which established rules for determining when a defendant's prior conviction counted as an enumerated predicate offense (e.g., burglary) under the Armed Career Criminal Act.

The portion of <u>Johnson</u> that Defendants focus on concerns the statement that the Court's past holdings "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."  By way of example, <u>Johnson</u> cited <u>United States v. L. Cohen Grocery Co.</u>, 255 U.S. 81 (1921), in which the Supreme Court had held unconstitutionally vague a law that prohibited the setting of "any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries."  Because the law forbade no specific act, it left open "the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against."  <u>Id.</u> at 89.  <u>Johnson</u> noted that <u>Cohen</u> declared the law unconstitutionally vague even though one could imagine circumstances in which a particular rate or charge would be universally viewed as unjust or unreasonable.  For example, "charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable."  <u>Johnson</u>, 135 S. Ct. at 2561.

<u>Johnson</u> stated that, under that approach, courts must assess whether a crime qualifies as a violent felony in terms of the statutory elements of the crime, comparing those elements to the elements of the crime in its "generic" form.  A court's focus should not be on how an individual defendant may have offended. 135 S. St. at 2257.  The <u>Taylor</u> approach was clarified in <u>Descamps v. United States</u>, 133 S. Ct. 2776 (2013), and <u>Mathis v. United States</u>, 136 S. Ct. 2243 (2016).  Noting that <u>Taylor</u>'s categorical approach is inapplicable here, the parties in this case indicate that there is no conceivable analogue to the categorical approach that could apply here.

_Johnson_ then concluded that the Court's past "decisions refute any suggestion that the existence of some obviously risky crimes establishes the residual clause's constitutionality." _Id._

Here, unlike in _Cohen_, the court is not being asked to examine a law that forbids no specific conduct.  Instead, Defendants were required to get a permit to store, treat, or dispose of hazardous waste.  In relevant part, Hawaii's Administrative Rules define "solid waste" as "hazardous" when the waste demonstrates "reactivity."  _See_ Haw. Admin. R. 11-261-3. "Reactivity" exists when waste is "capable of detonation or explosive reaction if it is subjected to a strong initiating source or if heated under confinement," or "[i]t is readily capable of detonation or explosive decomposition or reaction at standard temperature and pressure."  Hawaii Administrative Rule §§ 11-261-23(6), (7).

According to Defendants' purported expert, Dr. John Steinberg, a medical doctor with training and experience with respect to fireworks, _see_ ECF No. 148-2, PageID #s 1809-41, "[m]any innocuous substances are capable of explosive reaction if heated under confinement," including anything containing water." ECF No. 148-2, PageID 1807-08.  The Government does not challenge Dr. Steinberg's qualifications to give such an opinion, and the court accepts for purposes of this motion his statement that things such as soft drinks, milk, and cottage cheese can undergo

35

an explosive reaction when "heated under confinement," creating steam or highly pressurized gasses.  Nevertheless, the court concludes that Defendants fail to show that the reactive properties of these "innocuous" substances show the unconstitutional vagueness of any provision in issue here.

Initially, the court notes that household use of soft drinks, cottage cheese, milk, shaving cream, hair spray, or anything else coming from a household is not relevant to this discussion.  Household wastes are expressly exempted from being "hazardous waste" for purposes of RCRA and Hawaii's Hazardous Waste Management Plan.  40 C.F.R. § 261.4(b)(1); Haw. Admin. R. § 11-261.4(b)(1).  Moreover, even if an item is not coming from a household but is instead in the possession of a manufacturer or other business, it is not "hazardous waste" unless that business exceeds a designated volume of hazardous waste.  No hazardous waste permit is required for "small quantity generators," defined as entities that generate "no more than one-hundred kilograms of hazardous waste" in a calendar month.  See Haw. Admin. R. §§ 11-261-5(a) and (b).

As the Supreme Court has noted, "[s]tatutory language . . . cannot be construed in a vacuum.  It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  Roberts v. Sea-Land Servs., Inc., 132

36

S. Ct. 1350, 1357 (2012).  <u>Accord</u> <u>United States v. Lewis</u>, 67 F.3d 225, 228-29 (9th Cir. 1995) ("Particular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme.").  "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."  <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979).  <u>Accord</u> <u>United States v. Thomsen</u>, __ F.3d __, 2016 WL 4039711, *5 (9th Cir. July 28, 2016) ("We interpret statutory terms in accordance with their ordinary meaning, unless the statute clearly expresses an intention to the contrary." (quoting <u>United States v. Neal</u>, 776 F.3d 645, 652 (9th Cir. 2015)).  "Additionally, '[p]articular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme."  <u>Thomsen</u>, __ F.3d __, 2016 WL 4039711, *5 (quoting <u>Neal</u>, 776 F.3d at 652).  In other words, "[i]nterpretation of a word or phrase [in a statute] depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."  <u>United States v. Leal-Felix</u>, 665 F.3d 1037, 1042 (9th Cir. 2011).

The "ordinary, contemporary, common meaning" of the word "explosion" can be found in <u>The American Heritage Dictionary</u>, which, in relevant part, defines "explosion" as:

> **1a**. A release of mechanical, chemical, or
> nuclear energy in a sudden and often violent

>manner with the generation of high
>temperature and usually with the release of
>gases.  **b.** a violent bursting as a result of
>internal pressure.  **c.** The loud, sharp sound
>made as a result of either of these actions.

The American Heritage Dictionary, https://ahdictionary.com/word/
search.html?q=explosion&submit.x=30&submit.y=23 (last visited
August 17, 2016); The American Heritage Dictionary at 625 (5th
ed. 2011); see also http://www.dictionary.com/browse/
explosion?s=t (defining "explosion" as "a violent expansion or
bursting with noise, as of gunpowder or a boiler") (last visited
August 17, 2016).

The "ordinary, contemporary, common meaning" of the
word "detonate" is "To explode or cause to explode."  The
American Heritage Dictionary, https://ahdictionary.com/word/
search.html?q=explosion&submit.x=30&submit.y=23 (last visited
August 17, 2016); The American Heritage Dictionary at 494 (5th
ed. 2011); see also http://www.dictionary.com/browse/detonate?s=t
(defining "detonate" as "to explode with suddenness and violence"
and "to cause (something explosive) to explode") (last visited
August 17, 2016).

Defendants do not show that the charges against them
must be dismissed because these ordinary definitions and RCRA's
overall statutory scheme failed to provide notice of what conduct
violated the prohibition on storing and treating hazardous waste
without a permit.

38

In promulgating its Final Rules with respect to the applicable provisions in the Code of Federal Regulations, the EPA was required "to identify the characteristics of and to list those solid wastes which must be managed as hazardous wastes." 45 F.R. 33084 (May 19, 1080). Stating that the "improper management of hazardous waste is probably the most serious environmental problem in the United States today," the EPA noted that in 1979 over 50 million tons of hazardous waste had been transported, treated, stored, or disposed of in a way that endangered human health and the environment. Id. The EPA pointed to groundwater pollution that had harmed or killed animal and aquatic life; vaporization of volatile material that had caused respiratory illnesses, skin diseases, and elevated toxic materials in the blood and tissues of humans and livestock; and other events such as fires and explosions. 45 F.R. 22085.

It was against this backdrop that Congress enacted RCRA, requiring the EPA to establish a "cradle to grave" management system for hazardous waste. Id. Congress clearly wanted a national system that ensured the proper management of hazardous wastes so that they would not endanger human health and the environment. Id.; see also Meghrig v. KFC W., Inc., 516 U.S. at 483. The clarity of that purpose must be considered in assessing Defendants' argument that they were not on notice of what "explode" meant because the provisions Defendants are

39

charged with violating apply even to innocuous substances that can "explode."

In Elias, which Defendants concede remains good law after Johnson, see ECF No. 148-1, PageID # 1795, the Ninth Circuit, as noted earlier, held that "reactivity" as defined in 40 C.F.R. § 261.23 applied to a "select group of persons having specialized knowledge." 269 F.3d at 1014. In analyzing whether the cyanide regulation was unconstitutionally vague, the Ninth Circuit examined "whether persons like Elias, whose businesses involve use, storage, and disposal of hazardous wastes, would have understood that the tank waste was reactive and thus hazardous." Id. at 1015. The Ninth Circuit thus looked to a reasonable person in the industry.

Under Elias, the definition of "reactivity" in 40 C.F.R. § 261.23 must be examined in light of Defendants' expertise in the storage and destruction of munitions and explosives. Defendants are in the business of disposing of items such as unexploded ordnance. They are not laypersons. The court notes that DEI had previously obtained a 90-day Temporary Emergency Permit from the State of Hawaii to dispose of the Lindsey Fireworks. That circumstance cuts against dismissing the charges on the ground that Defendants could not have understood the administrative rules governing permits for the treatment, storage, and disposal of fireworks.

40

As Defendants note, Elias referred not only to
specialized knowledge but also to "challenged phraseology . . .
indigenous to the idiom of that class."  Defendants argue that
there is no such idiom in the provisions they challenge such that
the "specialist" standard in Elias is triggered.  But even if
this court does not apply Elias's teaching on that point,
Defendants do not win the day.  Even a reasonable layperson of
ordinary intelligence might well have understood that fireworks
are capable of detonating or explosive reaction if subjected to a
strong initiating source or heated under confinement, or that
fireworks are readily capable of detonating or explosive
decomposition or reaction at standard temperature and pressure.
Such a reasonable person would have understood that
administrative rules governing reactivity covered fireworks.

## 2. Defendants Do Not Show That The Administrative Rules With Respect to Reactivity Allow Arbitrary Enforcement.

Defendants' vagueness argument includes the contention
that, because the rules are so broad that they can be read to
cover innocuous substances like canned soda or beer, the rules
allow for arbitrary enforcement.  See ECF No. 125-1, PageID
# 1199.  Rules that are overbroad provide no standard governing
the exercise of discretion and encourage arbitrary or
discriminatory enforcement.  Desertrain v. City of Los Angeles,
754 F.3d 1147, 1156 (9th Cir. 2014).

An enactment "may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." City of Chicago v. Morales, 527 U.S. 41, 52 (1999). In Kolender v. Lawson, 461 U.S. 352, 355-56 (1983), the Supreme Court examined a facial challenge to a California criminal statute that required persons who loitered or wandered the streets to provide "credible and reliable" identification and to account for their presence when requested by a peace officer under circumstances that would justify a stop under the standards of Terry v. Ohio, 392 U.S. 1 (1968). Because the statute contained no standard for determining what a suspect had to do to provide "credible and reliable" identification, the Supreme Court noted that the law "vested virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute and must be permitted to go on his way in the absence of probable cause to arrest." Id. at 358. The law permitted "standardless sweep[s]" and allowed police, prosecutors, and juries to pursue "their personal predilections." Id. The Court therefore found the statute unconstitutionally vague. Id. at 361.

The present case does not involve any law permitting a "standardless sweep" or allowing officials to "pursue their personal predilections." Determining whether something is

42

"capable of detonation or explosive reaction" when a heat source is applied to it or whether something is "readily capable of detonation or explosive decomposition or reaction at standard temperature and pressure" is not comparable to determining whether something is "credible and reliable."  The household and small quantity generator exemptions, applied in the context of RCRA's purpose, remove certain actions from being subject to the vagueness of discretionary official action.  The permitting requirements apply to items of a defined type, a defined source (i.e., not a household), and a defined volume.

In their reply memorandum in support of the motion, ECF No. 132, Defendants raise some matters for the first time.  Those arguments are disregarded pursuant to Local Rule 7.4 ("Any argument raised for the first time in the reply shall be disregarded.").  Local Rule 7.4 is made applicable to criminal cases by Criminal Local Rule 12.3.

Even if this court did reach the argument, raised for the first time in the reply, that the rules must be overbroad because Hawaii's Department of Health gave DEI conflicting information about them, allegedly demonstrating how arbitrarily the Administrative Rules can be enforced, the argument does not justify dismissing the charges.  See ECF No. 132, PageID # 1722. Defendants point to a letter dated June 7, 2010, from Wilfred K. Nagamine, the Manager of the Clear Air Branch of the Department

43

of Health.  Addressing air quality standards when fireworks are destroyed by burning, Nagamine said that determining which federal regulation applied to an incinerator depended on whether the fireworks were municipal or solid wastes.  See ECF No. 132-2.

Nothing in the record suggests that Nagamine was someone authorized or trained to classify fireworks.  Even if he was, nothing in the record indicates that he had conducted any examination of the fireworks that permitted him to classify them.  More importantly, his letter clearly advised that a permit was required no matter which classification applied.  Nagamine's letter therefore provides no support for dismissing the charges in this case on "arbitrary enforcement" grounds.

V.        **CONCLUSION.**

The motion to dismiss the indictment based on due process concerns is denied.



IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 22, 2016.

          /s/ Susan Oki Mollway
          Susan Oki Mollway
          United States District Judge

United States of American v. Donaldson Enterprises, et al., Crim. No. 12-01034 SOM; Order Denying Motion to Dismiss Based on Alleged Due Process Violations.